**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| CAPITOL INFRASTRUCTURE, LLC, et al.,[1] | ) Case No. 12-11362 (KG) |
| Debtors. | ) Jointly Administered |
| | ) **Hearing Date:** June 14, 2012, at 10 a.m. ET |
| | ) **Objection Deadline:** June 7, 2012, at 10 a.m. ET |

**MOTION OF DIRECTV, LLC FOR ENTRY OF AN ORDER TO COMPEL
DEBTORS' ASSUMPTION OR REJECTION OF RIGHT OF ENTRY AGREEMENTS**

DIRECTV, LLC (f/k/a DIRECTV, Inc.) ("DIRECTV") files this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, compelling the above-captioned debtors and debtors in possession (collectively, the "Debtors") to assume or reject immediately certain Right of Entry Agreements and certain related Bulk Property Registration Agreements (collectively the "ROE Agreements") with DIRECTV, listed on **Exhibit B** attached hereto.[2] In support of this Motion, DIRECTV respectfully states as follows.

**Preliminary Statement**

By this Motion, DIRECTV seeks to compel the Debtors to immediately assume or reject the ROE Agreements—agreements that the Debtors apparently do not intend to assume and

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): Accelera Services, LLC (6589); Amenity Broadband, LLC (7012); BA Infrastructure SPE, LLC (6610); Baldwin County Internet/DSSI Service, L.L.C. (8858); Broadstar, LLC (8917); Capitol Broadband Development Company, LLC (4515); Capitol Broadband Management Corporation (4260); Capitol Broadband Ventures, LLC (3976); Capitol Infrastructure, LLC (0323); Capitol Infrastructure CP Funding, LLC (1008); CB Infrastructure SPE, LLC (4470); Infrastructure SPE, LLC (1144); and SMARTRESORT CO., L.L.C. (3706). The Debtors' corporate headquarters is located at 111 Corning Road, Suite 250, Cary, NC 27518.

[2] DIRECTV reserves its rights to supplement or otherwise amend the schedule of ROE Agreements contained in Exhibit B.

assign in connection with their multiple asset sales and agreements that would be impossible for the Debtors to assume or perform after those sales close.

Although the Debtors have sought to assume and assign to Hotwire certain identified agreements with DIRECTV (namely the MDU Master System Operator Agreement,[3] the MDU Service Provider Agreement, and the Key Account Operator Agreement), those agreements are patently un-assumable.[4] In any event, on information and belief (and based on conversations with Debtors' counsel), those identified agreements proposed to be assumed and assigned do *not* include the ROE Agreements, which are the subject of this Motion.[5]

Under the ROE Agreements, the Debtors granted DIRECTV, among other things, access to the properties to allow DIRECTV to (i) install, maintain, and operate the Signal Distribution System on the MDU Property, enabling the residents of such property to receive DIRECTV Service and (ii) market, solicit, and take orders for DIRECTV service from MDU property residents. The entire foundation for the Debtors' ability to perform under the ROE Agreements

---

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in *DIRECTV, LLC's Objection to Debtors' Assumption and Assignment of Executory Contracts and Proposed Cure Amounts* (the "Cure Objection") [Docket No. 416].

[4] As noted in DIRECTV's Cure Objection, DIRECTV has objected to the assumption and assignment of these agreements because, among other things, DIRECTV validly terminated such agreements prepetition.

[5] The Debtors have also included a list of DIRECTV contracts to be assumed and assigned in Schedule 2.1(b)-2 to the Stalking Horse Purchase Agreement, attached as Exhibit C to the Debtors' Sale Procedures Motion [Docket No. 11] and have filed a revised list of these contracts [Docket No. 318]. Certain ROE Agreements are included in that Schedule. However, there are discrepancies between the contracts set forth in Schedule 2.1(b)-2 and supplemented by the Debtors [Docket Nos. 291, 294, 304, 317] and those included in the Revised Cure Notice. The Debtors have also removed certain executory contracts and unexpired leases from the Cure Notices [Docket No. 290].

More importantly, in the Debtors' Revised Cure Notice, the Debtors state that the Revised Cure Notice supersedes the Cure Notice and controls in the event of any inconsistencies between the Revised Cure Notice and the Stalking Horse Purchase Agreement. The Revised Cure Notice does not include any ROE Agreements as contracts to be assumed and assigned. Given the Debtors' statement in the Revised Cure Notice that the Revised Cure Notice controls over the information contained in the Stalking Horse Purchase Agreement, the failure of the Debtors to file any new cure notice subsequent to the Revised Cure Notice, and based on conversations with Debtors' counsel, DIRECTV understands the Revised Cure Notice to control over what is contained in the Stalking Horse Purchase Agreement and supplements thereto.

is the Debtors' ownership of access rights to properties that the Debtors intend to sell to Hotwire or another purchaser (such as through the transfer of Master Community Infrastructure Agreements (each an "MCIA") or property-specific easements). If the ROE Agreements are assumed and assigned to a purchaser, which makes common sense, the purchaser, property managers, and subscribers will be assured of continued DIRECTV programming. Conversely, if the Debtors' rights under MCIAs and easements are transferred without an assumption and assignment of the ROE Agreements, the foundation of the ROE Agreements will vanish and, as a consequence, the Debtors could never thereafter perform under the ROE Agreements, and they accordingly must be rejected.

Upon rejection of the ROE Agreements, if a new arrangement is not reached between a qualified purchaser and DIRECTV, (i) DIRECTV will have the right to remove its equipment from the properties and, therefore, the functionality of the Signal Distribution System, (ii) no television service will be provided over the Signal Distribution System, (iii) the Debtors (or any transferee) will lose the ability to perform billing and collections in bulk, and (iv) DIRECTV will have no obligation to provide DIRECTV service to the Debtors (and any purchaser). The result of all of this is that if the applicable ROE Agreements are not assumed and a new arrangement is not entered into, neither the Debtors nor any purchaser will be able to continue performing under the DIRECTV agreements that the Debtors propose to assume and assign. Thus, the Debtors and any purchaser will be unable to provide adequate assurance of future performance. Purchasers will have no right or obligation to provide DIRECTV programming, and DIRECTV will have no obligation to provide service, and, while not a bidder for any assets that are subject to the Hotwire sale, DIRECTV has been actively engaged in discussions with Hotwire and at least one other bidder and is hopeful that acceptable alternative agreements can be reached.

The Court can bring much needed clarity to these chapter 11 cases by compelling the Debtors to decide immediately whether they are assuming or rejecting the ROE Agreements. Providing such clarity will enable DIRECTV, MDU Property owners, any purchaser, and, most importantly, customers to understand what the Debtors intend to do with the DIRECTV service, will allow parties to engage in the process of transitioning service with minimal disruption and inconvenience, and will help bring order to the confusion and frustration that have marked these chapter 11 cases. Indeed, given the structure and purpose of the ROE Agreements, there is no alternative other than to require the Debtors to choose the immediate assumption or rejection of these agreements.

## Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory basis for the relief requested herein is section 365(d)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6006(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4. On April 26, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No trustee, examiner, creditors' committee, or other official committee has been appointed in the Debtors' chapter 11 cases.

7. A general description of the Debtors' business, capital structure, and the circumstances leading to the chapter 11 filings is generally set forth in the Declaration of Glen D. Lang in Support of Chapter 11 Petitions and First Day Motions (the "Lang Declaration") [Docket No. 4]. DIRECTV continues to reserve its rights to object to the introduction of the Lang Declaration as evidence and to challenge the accuracy of certain statements contained in the Lang Declaration because of what DIRECTV regards as inaccuracies and misrepresentations regarding DIRECTV's role in the events leading up to the Debtors' bankruptcy filing.

8. Prior to the Petition Date, DIRECTV entered into numerous agreements with the Debtors to provide DIRECTV programming to residents of MDU Properties. Certain of these agreements, which are described more fully in the Cure Objection, established and governed— with various other agreements—the business relationship among DIRECTV and the Debtors.

9. In conjunction with these agreements, DIRECTV entered into numerous ROE Agreements with the Debtors. Pursuant to such agreements, the Debtors granted DIRECTV access to MDU Properties using rights of access the Debtors had obtained from MDU Property owners and agreed to pay DIRECTV for programming for ten years. In exchange for such access, DIRECTV agreed to (i) install, maintain, and operate the Signal Distribution System on the MDU Property, enabling the residents of such property to receive DIRECTV Service, (ii) market, solicit, and take orders for DIRECTV service from MDU property residents, and (iii) provide DIRECTV service to the MDU Property and its residents.

10. Prior to the Petition Date, the Debtors advised DIRECTV that they believed their business was no longer viable and that they planned to transition their business as soon as

possible to another operator. DIRECTV engaged in vigorous, but ultimately unsuccessful negotiations with the Debtors to achieve a transition and a consensual, out-of-court restructuring. During these negotiations, DIRECTV learned that the Debtors were continuing to collect fees from DIRECTV subscribers without remitting those amounts to DIRECTV as required by the agreements between the parties. Because the Debtors already had breached numerous agreements with DIRECTV for, among other reasons, a continuing failure to remit amounts due and owing to DIRECTV, and admitting to DIRECTV that they would be unable to cure defaults and comply with the agreements, DIRECTV decided to terminate the B&C Agreement, MSO Agreement, Service Provider Agreement, and KAO Agreement in accordance with the termination provisions thereof, and did so by written notice to the Debtors on March 9, 2012, as described more fully in the Cure Objection.

11. On the Petition Date, the Debtors sought authority to sell certain assets to stalking horse bidder Hotwire Communications, Ltd. (the "Purchaser") for $11 million [Docket No. 11]. On May 4, 2012, the Debtors sought authority to sell certain other assets (the "Other Assets") though a sale process to the highest bidder [Docket No. 83]. The Debtors lack a stalking horse bidder for these Other Assets.

12. On May 11, 2012, the Debtors filed the *Notice of (I) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Proposed Cure Amounts in Connection with Executory Contracts and Unexpired Leases and (III) Requests for Adequate Assurance of Future Performance Concerning Hotwire Communications, Ltd.* (the "Cure Notice") [Docket No. 199], which listed those executory contracts the Debtors were seeking to assume and assign, either to the Purchaser or as part of the other asset sale.

13. On May 15, 2012, the Court entered an order approving the sale procedures for the sale of certain assets to the Purchaser (the "Sale Procedures Order") [Docket No. 235] and an order approving sale procedures for the sale of the Other Assets (the "Other Assets Sale Procedures Order") [Docket No. 230]. The Sale Procedures Order provides that the Debtors may assume and assign executory contracts and gives parties the right to object to such assumption and assignment and the Debtors' proposed cure amounts.

14. On May 18, 2012, the Debtors filed the *Reformatted Notice of Executory Contracts and Unexpired Leases* [Docket No. 296] (the "Revised Cure Notice" and, collectively with the Cure Notice, the "Cure Notices"). The Cure Notices indicate that the Debtors seek to assume and assign the KAO Agreement, the Service Provider Agreement, and the MSO Agreement with DIRECTV. The Debtors have grouped these agreements on a per-property basis, suggesting that there is a separate set of agreements for each property, which is not the case, as discussed more fully in the Cure Objection.

15. The Revised Cure Notice also provides that "[e]ach contract listed above includes all amendments, addendums, assignments, easements, licenses, royalties and grants of rights related thereto." Upon information and belief (based on discussions with Debtors' counsel), as well as the statement in the Revised Cure Notice that the Revised Cure Notice controls over the information contained in the Stalking Horse Purchase Agreement, DIRECTV believes these other agreements do not include the ROE Agreements between the Debtors and DIRECTV.

16. Among other things, the ROE Agreements facilitate DIRECTV's ability, either by itself or through a service provider, to install and service the Signal Distribution System and market, sell, and distribute television programming to MDU Property residents. For properties where the Debtors elected the "Bulk Programming" option, the Debtors became obligated to pay

DIRECTV a bulk amount based on the number of units at the property, for the term of the ROE Agreement (generally ten years). For properties where DIRECTV provided funding for the Signal Distribution System—which includes all properties that are subject to this Motion—the ROE Agreements also clearly establish and acknowledge DIRECTV's ownership of the Signal Distribution System.[6]

17. The Debtors' transfer of the underlying rights of access to the MDU Properties *without* an assumption and assignment of the ROE Agreements will make it impossible for the Debtors to perform under the ROE Agreements. As noted above, the ROE Agreements are premised on the Debtors' ownership of a right of access to the MDU Properties. If and when those access rights are transferred to a purchaser, the Debtors would no longer have a right of access to grant DIRECTV, rendering the Debtors unable to perform under the ROE Agreements. The Debtors have also admitted that they will not continue to operate for any appreciable length of time after the sales, and it is clear they could not pay the bulk programming obligations to DIRECTV for the term of the ROE Agreements. If the ROE Agreements are not transferred, DIRECTV will be under no obligation to continue providing DIRECTV service to the Purchaser or another successful purchaser after consummation of the asset sales without reaching a new agreement with DIRECTV. Of equal importance, there will be continued uncertainty regarding the rights and obligations of the respective parties as long as the Debtors have not formally assumed or rejected the ROE Agreements.

---

[6] Certain ROE Agreements include Bulk Property Registration Agreements, which, among other things, permit the Debtors to sell DIRECTV service on a digital bulk basis, *i.e.*, based on the total units in a MDU Property and not on the actual number of units receiving DIRECTV service.

**Relief Requested**

18.     By this Motion, DIRECTV respectfully requests entry of an order, pursuant to section 365(d)(2) of the Bankruptcy Code, compelling the Debtors to assume or reject the ROE Agreements immediately.

**Basis for Relief Requested**

19.     Section 365(d)(2) of the Bankruptcy Code authorizes the Court to require a debtor to assume or reject an executory contract within a specified period of time upon the request of any party to such executory contract. Specifically, section 365(d)(2) provides:

> the trustee may assume or reject an executory contract or unexpired lease . . . at any time before the confirmation of a plan . . . but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2). "Congress intended this provision to 'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerting their status vis-à-vis the estate.'" *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845).

20.     The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion "in light of the circumstances of each case." *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982) (citing *In re Flying W. Airways*, 328 F.Supp. 1256, 1258 (E.D. Pa. 1971)); s*ee also In re Dana Corp.*, 350 B.R. 144, 147-48 (Bankr. S.D.N.Y. 2006) (citations omitted).

21.     Courts have considered a variety of factors in determining whether to shorten the period in which a debtor must assume or reject an executory contract, including the importance

of the contracts to the debtor's business and reorganization, the debtor's failure or ability to satisfy postpetition obligations, the nature of the interests at stake, the balance of hurt to the litigants and the good to be achieved, and the damage the nondebtor will suffer beyond the compensation available under the Bankruptcy Code.[7] *See In re Dana Corp.,* 350 B.R. at 147-48 (citations omitted); *see also In re Enron Corp.,* 279 B.R. at 702; *In re Teligent, Inc.,* 268 B.R. at 728; *In re Lionel Corp.,* 23 B.R. at 225. Courts in the Third Circuit, specifically, in determining whether to accelerate a debtor's decision to assume or reject an executory contract, "balance the interests of the contracting party against the interests of the debtors and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001).

22. Balancing the factors enumerated above weighs completely in favor of compelling the Debtors to assume or reject the ROE Agreements immediately. In fact, there are not really any factors to balance on the Debtors' side of the equation given the circumstances of this case. As discussed above, after the Debtors complete their contemplated sales, the Debtors' continued performance under the ROE Agreements post-sale will be *impossible*, as the Debtors will no longer own the access rights that are the foundation of the ROE Agreements. Moreover, if not assumed and assigned, the ROE Agreements are clearly not essential to the Debtors' reorganization, as the Debtors have admitted that they do not intend to reorganize, and the ROE Agreements have absolutely no value to the Debtors after they sell the assets that would allow them to perform under the ROE Agreements. Therefore, after the contemplated sales, the

---

[7] Other factors considered by courts include whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan; the safeguards afforded the litigants; whether there is a need for judicial determination as to whether an executory contract exists; whether exclusivity has been terminated; whether the action to be taken is so in derogation of Congress's scheme that the court may be said to be arbitrary; and the purpose of chapter 11, which is to permit successful rehabilitation of debtors. *See In re Dana Corp.,* 350 B.R. at 147-48; *see also In re Enron Corp.,* 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002); *In re Teligent, Inc.,* 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001); *In re Lionel Corp.,* 23 B.R. 224, 225 (Bankr. S.D.N.Y. 1982).

Debtors would have absolutely no interests to balance against DIRECTV's substantial interests in the ROE Agreements. The Debtors would gain nothing for their estates from postponing the rejection ROE Agreements under which they cannot perform. In contrast, DIRECTV would be harmed if the ROE Agreements are kept in limbo, as the lack of clarity and certainty regarding the ROE Agreements would (i) complicate DIRECTV's efforts to enter into new agreements with MDU Property owners and subscribers for the continuation of DIRECTV service, (ii) sow confusion about whether DIRECTV service is being provided under the ROE Agreements or new agreements, and (iii) lead to further confusion and disputes regarding which party is obligated to bill for and to pay for DIRECTV service provided postpetition and following consummation of the Debtors' asset sales.

23.    The current status of the ROE Agreements—in limbo between assumption and rejection—is thus extremely prejudicial to DIRECTV, the owners of MDU Properties, and to DIRECTV subscribers. The uncertainty about the future of DIRECTV service and the service disruptions that have already occurred—despite the Debtors' assurances that such disruptions would not occur—have produced an intolerable situation with no clarity, no transparency, and no way for DIRECTV to assure its customers of its ability (or the ability of any purchaser) to provide continued service.

24.    Unless assumption and assignment is assured, there is no reason the Debtors cannot reject the ROE Agreements now, instead of waiting and keeping DIRECTV, the MDU Properties, and subscribers in limbo. It is certain that the Debtors cannot perform under the ROE Agreements following the asset sales—regardless of whether those agreements are rejected now or later—so there is absolutely nothing that could be gained for the Debtors' estates from deferring rejection of the ROE Agreements. Based upon the foregoing, the balance of the

equities overwhelmingly favors this Court granting the Motion and requiring the Debtors to act now to assume or reject the ROE Agreements.

25.     Further, as discussed above, upon rejection of the ROE Agreements, if other alternative arrangements are not reached between DIRECTV and property owners, DIRECTV will have no ongoing obligation to maintain the Signal Distribution System and provide DIRECTV service to the MDU Properties. The Debtors' estates will have no property interest in DIRECTV's Signal Distribution Systems or post-sale programming for properties subject to the sale, and DIRECTV will have the right to remove any Signal Distribution Systems it owns.

26.     DIRECTV will continue to suffer significant hardship if the limbo created by the Debtors' failure to assume or reject the ROE Agreements that cannot be performed prevents DIRECTV from turning off the Signal Distribution System and retrieving its property. DIRECTV has invested significant resources in the installation and maintenance of the Signal Distribution System and associated equipment, investments that could be lost if DIRECTV is unable to retrieve its equipment and deploy it elsewhere. Such equipment could be lost, damaged, or stolen if DIRECTV is unable to retrieve it. In addition, if DIRECTV is barred from accessing the Signal Distribution System to shut it down, DIRECTV would be forced to continue providing service to MDU Properties and subscribers without being compensated. Thus, although DIRECTV will seek new agreements with the purchasers to continue DIRECTV service with no disruption, if the ROE Agreements are rejected and no new agreements are reached, DIRECTV will have no choice but to remove the Signal Distribution System and other DIRECTV equipment from the MDU Properties.

27. DIRECTV also expressly reserves its rights to pursue an administrative claim against the Debtors for DIRECTV programming services provided to the Debtors postpetition and for any damages caused by the Debtors to DIRECTV property.

## No Prior Request

28. No prior request for the relief sought herein has been made to this or any other court.

## Notice

29. Notice of this Motion will be provided pursuant to Bankruptcy Rule 2002 and such other rules as may be applicable. DIRECTV respectfully submits that no further notice is required.

WHEREFORE, for the reasons set forth herein, DIRECTV respectfully requests that the Court enter an order compelling the Debtors to assume or reject the ROE Agreements immediately.

Dated:  May 31, 2012  
       Wilmington, Delaware

*/s/ Bradley R. Aronstam*  
Bradley R. Aronstam (No. 5129)  
Garrett B. Moritz (No. 5646)  
SEITZ ROSS ARONSTAM & MORITZ LLP  
100 South West Street, Suite 400  
Wilmington, Delaware  19801  
Telephone:  (302) 576-1600  
Facsimile:  (302) 576-1100  
baronstam@seitzross.com  
gmoritz@seitzross.com  

- and -

David L. Eaton (admitted *pro hac vice*)  
Adam Paul (admitted *pro hac vice*)  
Todd M. Schwartz (admitted *pro hac vice*)  
KIRKLAND & ELLIS LLP  
300 North LaSalle Boulevard  
Chicago, Illinois 60654  
Telephone:  (312) 862-2000  
Facsimile:  (312) 862-2200  
david.eaton@kirkland.com  
adam.paul@kirkland.com  
todd.schwartz@kirkland.com  

Michael E. Baumann (admitted *pro hac vice*)  
KIRKLAND & ELLIS LLP  
333 South Hope Street  
Los Angeles, California  90071  
Telephone:  (213) 680-8424  
Facsimile:  (213) 680-8500  
mbaumann@kirkland.com  

*Attorneys for DIRECTV, LLC*